THORNBERRY, Circuit Judge:
In 1983, GHR Energy Corporation and Southern States Exploration, Inc. (collectively referred to hereinafter as “GHR”) filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. As part of GHR’s reorganization, NL Industries, Inc. (“NL”) agreed to service ten of GHR’s gas wells in an attempt to increase their production. The agreement required NL to service the wells using whatever method GHR stipulated but also provided that S.A. Holditch & Associates, Inc. (“Holditch”), an engineering firm, would review GHR’s designs. NL agreed to be paid solely from the revenue produced by the re-worked wells.
*425 NL performed the services that GHR requested, but the wells failed to produce as expected, and NL did not recover its costs. NL sued GHR under a variety of theories, but the pith of its complaint was that GHR used a much riskier and more expensive method to re-work the wells than the method NL thought it would use. NL also sued Holditch, asserting that Holditch failed to use reasonable care in reviewing GHR’s designs.
GHR moved for partial summary judgment asking the district court to dismiss only NL’s claim for punitive damages and its breach of contract and negligence theories. The district court, however, issued an order dismissing NL’s entire complaint against GHR. Also, the district court granted Holditch’s motion for summary judgment after concluding that Holditch was an arbiter under the agreement and, therefore, was not liable to NL for negligence.
We AFFIRM the district court’s decision to dismiss Holditch from the litigation, but because the district court did not notify NL that its entire complaint against GHR was at risk, we REVERSE that portion of the district court’s order which dismissed issues not raised in GHR’s motion for partial summary judgment; those claims are REMANDED to the district court for further proceedings. We AFFIRM the dismissal of NL’s claim for punitive damages, negligence, and most of the issues raised under its breach of contract theory. But NL has produced enough evidence that GHR’s method for servicing the wells did not conform to the agreement to survive summary judgment; therefore, we REVERSE the dismissal of that portion of NL’s breach of contract theory and REMAND it to the district court.
I. FACTS AND PROCEDURAL HISTORY
A. The Ill-Fated Workover Agreement Most of GHR’s income comes from the production of oil and gas from more than 300,000 acres of mineral leaseholds in Webb and Zapata counties in Southwest Texas. To generate more revenue for GHR’s bankruptcy estate,[1] in April 1985 the bankruptcy court authorized GHR to enter into a workover agreement with NL, an internationally known corporation specializing in wellsite drilling services. See Agreement for Recompletion, Reworking and Related Activities on Oil and Gas Wells in Webb and Zapata Counties, Texas (“Agreement”), reprinted in Exhibits to NL’s Memorandum in Opposition to GHR’s Motion for Partial Summary Judgment (“NL’s Exhibits”), vol. 1, tab 1. The work-over agreement provided that NL would use “production enhancement procedures” to increase production from ten of GHR’s existing gas wells.
Production from a well can be increased in a number of ways,[2] but in this case, GHR asked NL to augment production by fracturing the hydrocarbon formations under the wells. “Fracturing” is “[a] process of opening up underground channels in hydrocarbon-bearing formations, by force, rather than by chemical action such as acidizing.” See 8 H. Williams & C. Meyers, Oil and Gas Law 379 (1987) [hereinafter Oil and Gas Law]. A liquid or other substance, such as sand, is pumped into a well “to crack (fracture) and prop open the hydrocarbon bearing formation” and create channels through which the gas or oil can be extracted. See id. at 377. The method by which this is done is referred -to as a “fracture treatment” or “frac.”
The agreement required NL to finance the workover of the ten wells. To compensate NL for its services, GHR assigned NL a “proceeds production payment” equal to seventy-five percent of the “incremental net revenues” attributable to GHR’s working interest in the wells. See Agreement, Exhibit 7. In other words, NL would receive seventy-five percent of the net reve *426 nue from the sale of that portion of the gas attributable to the production enhancement procedures. The agreement stated that the income from the proceeds production payment was to be NL’s only source of compensation. See articles 5.1, 5.2. NL also received a right of first refusal for the performance of similar procedures on forty of GHR’s other wells.
The agreement stipulated that GHR was to determine the method for servicing the wells. GHR was to give NL a “detailed written prognosis” explaining how the production enhancement procedure for each well should be carried out, and NL was to perform each procedure “in strict accordance” with the prognosis unless GHR and NL agreed otherwise. See articles 4.1.a., 4.3.a. If GHR failed to submit the prognosis or if GHR’s instructions were inadequate, NL was required to notify GHR in writing. If GHR did not provide NL with the proper instructions within ten days, NL had the right to terminate the agreement. See article 4.3.d.
GHR wanted NL to fracture the wells. As with other production enhancement procedures, the agreement required GHR to instruct NL how to perform the fracture treatment, but its frac design was to be based on a model supplied by Holditch, a petroleum engineering consultant.[3] The agreement required GHR to provide NL with instructions for fracturing the well and with a fracture program approved by Holditch; if it failed to do so within ten days after being notified by NL, GHR was deemed to have elected not to fracture the well, and NL was to perform other production enhancement procedures stipulated by the prognosis. See article 4.3.Í.3.
The agreement also contained provisions to comfort GHR’s secured lenders, referred to as the “Banks.” From the beginning, the Banks were intimately connected to the agreement between GHR and NL. Before GHR could assign the proceeds production payment to NL, the Banks had to subordinate their pre-existing security interests in the production of GHR’s wells. Moreover, like any secured lender, the Banks needed to be confident about the financial viability of GHR before they would confirm GHR’s plan of reorganization. Recognizing this, the bankruptcy court required GHR to insert several provisions into the workover agreement to protect the Banks.[4]
The agreement contained other clauses that benefitted the Banks in addition to those required by the bankruptcy court,[5] *427 the most important of which provided that GHR could not authorize workovers on any well before Holditch and two other petroleum engineering consultants, Netherland, Sewell and Associates (“NSA”) and B.P. Huddleston & Co. (“Huddleston”), certified to the Banks that the workover would increase the discounted present value of future net revenue realized from each well by more than the anticipated cost of the work-over. ,See article 4.1.c. Although the Banks required GHR to include these provisions in the agreement, the Banks were not a third-party beneficiary of the agreement. See article 6.8.
As GHR explained to the bankruptcy court when it sought permission to consummate the agreement with NL, the parties expected the agreement to benefit everyone. GHR’s bankruptcy estate would be benefitted by increased production, and “[n]et revenues to GHR [would] increase dramatically once the procedures desired [were] employed.” See Motion for Authority to Enter Into Agreement with NL Industries, Inc. to Perform Recompletions, Work-overs, and Related Activities at 6, reprinted in Defendants GHR Energy Corporation and Southern States Exploration Inc.’s Motion for Partial Summary Judgment, Exhibit B, tab 135. Moreover, the agreement would impose no cash drain on the resources of GHR because NL would be paid only from increased production. As it turned out, the agreement benefitted no one. A portion of the parties’ misfortune can be ascribed to gas prices, which, instead of increasing from $3.40 to $7.50 per mcf (1000 cubic feet), as the parties had predicted, plummeted to less than $2.50 per mcf. NL attributes the remainder of the blame for its misadventure to GHR.
To induce NL to enter into the agreement, GHR had assured NL that the revenue produced by the workovers would compensate it for its expenses within six months. GHR estimated that the production enhancement procedures on the ten wells would cost about $9 million and would produce almost $65 million in present value net revenue. The workover actually cost more than $14 million and produced only $5.4 million in revenue. But NL did not rely solely on GHR’s sales pitch; before signing the agreement, NL received a more modest projection from NSA. Using GHR’s estimates of the cost of the workovers, NSA estimated that future revenue, discounted to present value, would be $26,647,000. See Letter to Peter H. Nielsen of NL from Clarence M. Nether-land of NSA, reprinted in Exhibits to GHR’s Supplemental Memorandum in Support of Motion for Partial Summary Judgement [sic] and Response to NL’s Opposition (“GHR’s Exhibits”), tab 8. GHR implies that NL also relied on a third projection from Huddleston, which estimated future net revenue to be $23 million. But this letter was dated May 14, 1985, more than a month after the parties had signed the agreement. See GHR’s Exhibits, tab 9.
NL attributes the high cost of servicing the wells and the subsequent lack of revenue to GHR’s frac designs. Before entering into the agreement with NL, GHR presented NL with a report which explained that GHR had performed fracture treatments on a series of fifty-five of its wells and had obtained $34 million of incremental net'income within the first fourteen months of production. See Technical Report, attached as Exhibit A to Affidavit of Robert J. Hurley, reprinted in NL’s Exhibits, vol. 1, tab 2. According to NL, all but three of these fifty-five fracture treatments were tailored to the characteristics of the reserves of each well. In other words, the length of each fracture treatment was designed specifically to extract as much gas as possible from a known reservoir. NL insists that it believed that GHR would use this type of frac to enhance production from the ten gas wells covered by the agreement and that article 4.3.Í.1 of the agreement limited GHR to this type of frac when it stated that any frac used must be “based upon a model prepared by Holditch.”
The fracture treatments that GHR prescribed for the ten wells were not tailored to the contours of each reservoir, however. Instead, GHR used what NL hyperbolically describes as “massive experimental fracs,” which were each 1500 feet long. By frac- *428 taring an area larger than the known reservoir, GHR hoped to extract hydrocarbons from potential, adjacent reservoirs without having to drill a new well.
GHR submitted its proposed fracs for seven of the ten wells to Holditch, and Holditch approved them. GHR did not ask Holditch to review its fracture treatment designs for the other three wells. Nevertheless, by December 1985, NL had completed the procedures on all ten wells. Because the incremental net revenue from the wells was much less than expected, NL did not receive enough to reimburse it for its costs.
B. The Road to Recovery
In August 1986, NL sued GHR in federal district court alleging state law claims for breach of contract, mutual mistake, misrepresentation, fraud, and negligence. See Complaint, reprinted in Record on Appeal (“R.”), vol. 5, tab 1, at 1114. NL sought $15,157,491 in actual damages and three times that amount in punitive damages. Jurisdiction was based on diversity of citizenship. That same day, NL filed a proof of claim in bankruptcy court for $15,157,-491, which NL stated was “[t]he full amount of [its] claim.” See Proof of Claim at 2, reprinted in NL’s Exhibits, vol. 2, tab 16. NL sought priority for its claim as an administrative expense, undertaken to preserve GHR’s bankruptcy estate. See Bankr.Code §§ 503(b)(1)(A), 507(a)(1).
In September 1986, GHR filed its answer to the district court proceeding and its objection to NL’s proof of claim in the bankruptcy court. One month later, GHR removed the district court proceeding to the bankruptcy court. NL filed a motion to withdraw reference, stating that the bankruptcy court lacked jurisdiction to adjudicate the merits of NL’s state law claims because ■ these claims were not “core proceedings.” See 28 U.S.C.A. § 157(b) (West Supp.1990). The bankruptcy judge agreed with NL and recommended that the district court retain jurisdiction over the case. The district judge agreed and entered an order retaining jurisdiction of NL’s claims. In the meantime, NL amended its district court pleading adding Holditch as a defendant. In September 1987, the bankruptcy court confirmed GHR’s Chapter 11 reorganization plan and classified NL’s claim as a disputed administrative expense to be paid if the district court found GHR liable.
In October 1989, Holditch moved for total summary judgment, see R., vol. 4, tab 133, at 356, and GHR filed a motion for partial summary judgment, see Defendants GHR Energy Corporation and Southern States Exploration Inc.’s Motion for Partial Summary Judgment (“Partial Summary Judgment Motion”), R., Loose in File, tab 135. NL filed memoranda opposing both summary judgment motions and also filed a motion seeking leave to amend its complaint again to assert additional claims against GHR and Holditch. The district court granted summary judgments in favor of both Holditch and GHR dismissing all NL’s claims against them. The court did not notify NL that it was considering dismissing NL’s entire case against GHR. In addition to granting both summary judgment motions, the court refused to give NL leave to amend its complaint. NL appeals, arguing that both summary judgment motions were improperly granted and that the district court abused its discretion when it refused to allow NL to amend its complaint.
II. DISCUSSION
A. Standard of Review
Like the district court, we must review the entire record to determine whether NL has presented enough evidence to warrant a trial on the merits of its actions against Holditch and GHR. See Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 872 (5th Cir.1991). Our review is guided by the same considerations that a district court would follow in deciding whether to grant a directed verdict: does “the evidence present[] a sufficient disagreement to require submission to a jury or [is it] so one-sided that one party must prevail as a matter of law”? See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).
*429 B. Summary Judgment in Favor of Hol-ditch
Article 4.3.Í.1 required GHR to submit its frac designs to Holditch for review, authorized Holditch to modify GHR’s designs, and provided that “all decisions or modifications by Holditch” with regard to these designs would “be final and binding upon” GHR and NL.[6] In January 1987, when it added Holditch as a defendant to its suit against GHR, NL sought to recover damages from Holditch under a negligence theory by asserting that Holditch had not used reasonable care in reviewing GHR’s designs. See NL Industries, Inc.’s Motion for Leave to File First Amended Complaint at 2, reprinted in R., vol. 2, tab 16, at 818. In October 1989, Holditch moved for summary judgment arguing that it was an arbiter under the contract and that it could not be liable to NL for negligence.
Texas law permits parties to appoint an' expert to act as an arbiter in reviewing engineering or construction designs before they are carried out. The language of article 4.3.Í.1 is-similar to the language of other arbiter provisions and clearly expresses the parties’ intent to name Holditch as an arbiter. Compare City of San Antonio v. McKenzie Constr. Co., 136 Tex. 315, 325, 150 S.W.2d 989, 995 (1941); Hook v. Cook, 345 S.W.2d 592, 592-93 (Tex.Civ.App.—Houston 1961, writ ref’d n.r.e.); Uvalde Rock Asphalt Co. v. Fantham, 210 S.W.2d 646, 648 (Tex.Civ.App.—Galveston 1948, no writ) with Black v. Acers, 178 5.W.2d 152, 154-55 (Tex.Civ.App.Dallas 1943, writ ref’d) (holding that parties who agreed that a house was “to meet requirements of the Federal Housing Administration,” did not intend to appoint the FHA as an arbiter). NL argues that article 4.3.Í.1 is ambiguous because article 6.7 of the workover agreement provided that any dispute between GHR and NL is to be resolved through arbitration, and if Holditch were an arbiter under the agreement, article 6.7 would be superfluous. But the parties only authorized Holditch to review and approve frac designs, not to resolve every dispute that could arise under the agreement. Therefore, the existence of article 6.7 does not tarnish Holditeh’s interpretation of article 4.3.I.I. Article 4.3.Í.1 unambiguously appointed Holditch to be an arbiter for the design of the fracture treatments for the ten wells.
If the parties do appoint an arbiter, the arbiter’s decision is final and conclusive unless the arbiter “is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment.” See McKenzie Constr. Co., 136 Tex. at 326, 150 S.W.2d at 996; State v. Buckner Constr. Co., 704 S.W.2d 837, 841 (Tex.App.-Houston [14th Dist.] 1985, writ ref’d n.r.e.); Austin Bridge Co. v. State, 550 S.W.2d 135, 137 (Tex.Civ.App. —Waco 1977, writ ref’d n.r.e.); Plantation Foods, Inc. v. R.J. Reagan Co., 520 S.W.2d 432, 434 (Tex.Civ.App.— ref’d n.r.e.). Consequently, Holditch could not be liable under a negligence theory, and the district court properly granted summary judgment in its favor.
NL’s final argument is that the district court should have permitted it to amend its pleading to allege a variety of additional complaints against Holditch. The district court denied NL’s motion for leave to file its second amended complaint, and the court did not abuse its discretion in doing so. See Overseas Inns S.A. P.A. v. United States, 911 F.2d 1146, 1150 (5th Cir.1990). If a plaintiff seeks to amend its pleading after a responsive pleading has been served, it must seek “leave of court” or “written consent of the adverse party;” then, “leave shall be freely given when justice so requires.” See Fed.R.Civ.P. 15(a) (emphasis added). NL sought to amend its pleading two years after it first brought Holditch into the litigation and only after Holditch had requested summary judgment. As NL provided no good reason for not acting sooner, justice did not require the district court to permit NL to amend its pleading. See Overseas Inns S.A. P.A. v. United States, 911 F.2d at 1151 (“A party should not, without adequate grounds, be permitted to avoid sum *430 mary judgment by the expedient of amending its complaint.”).
C. Summary Judgment in Favor of GHR

1. The Validity of Sua Sponte Summary Judgment

In its motion for partial summary judgment, GHR first sought the dismissal of NL’s action for punitive damages. GHR argued that its Chapter 11 reorganization plan discharged it from liability for punitive damages because NL never filed a proof of claim for punitive damages; i.e., NL’s proof of claim was limited to the amount of its actual damages. Next, GHR raised affirmative defenses to NL’s negligence and breach of contract complaints. First, GHR asserted that because Holditch was an arbiter and approved all GHR’s frac designs, GHR was shielded from negligence. Second, GHR contended that it had not breached the contract because it continued to pay NL the money due under the contract.[7] GHR did not ask the court to dismiss NL’s fraud or mutual mistake actions. Nevertheless, the district court dismissed all NL’s actions against GHR sua sponte, without informing NL that it intended to do this. See Summary Judgment (GHR), reprinted in R., vol. 1, tab 203, at 42.
In this circuit, it is unclear whether Federal Rule of Civil Procedure 56(c) permits a court to grant summary judgment in favor of a party that did not request it. Compare Capital Films Corp. v. Charles Fries Prods., Inc., 628 F.2d 387, 391-92 (5th Cir.1980) (noting that this circuit takes a strict construction approach to Rule 56, which means “that a motion for summary judgment is to be made by a party and that a district court is not authorized by Rule 56 to sua sponte enter summary judgment”) and John Deere Co. v. American Nat’l Bank, Stafford, 809 F.2d 1190, 1192 (5th Cir.1987) (holding that district court could not grant summary judgment sua sponte on grounds not requested by the moving party) with Page v. DeLaune, 837 F.2d 233, 238 (5th Cir.1988) (“A district court may grant summary judgment sua sponte when the parties have been given adequate time for discovery.”). The Supreme Court has indicated, however, that a district court may enter summary judgment sua sponte under certain circumstances. See Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (noting “that district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence”).
But we need not determine whether the district court had the power to dismiss NL’s entire case against GHR even though GHR only asked the court to dismiss a portion of that case. Even if the court did have that power, it could not exercise it without notifying NL at least ten days in advance that it intended to do so. See Fed.R.Civ.P. 56(c) (stating that a motion for summary judgment “shall be served at least 10 days before the time fixed for the hearing”); Celotex, 477 U.S. at 326, 106 S.Ct. at 2554; Burns v. Gadsden State Community College, 908 F.2d 1512, 1516 (11th Cir.1990); Interco Inc. v. National Sur. Corp., 900 F.2d 1264, 1268 (8th Cir.1990); Caribbean Produce Exch., Inc. v. Secretary of Health and Human Servs., 893 F.2d 3, 6 (1st Cir.1989); Pliley v. Sullivan, 892 F.2d 35, 37 (6th Cir.1989). The notification requirement enables the non-movant to place all the evidence supporting its position into the record so that a reviewing court can decide whether the non-movant has demonstrated the existence of a genuine dispute regarding a material
*431 fact. See Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1560-61 (1st Cir.1989). Any reasonable doubts about whether NL received notice that its entire case was at risk must be resolved in favor of NL. See id. at 1561.
To exploit the district court’s beneficence, GHR attempts to convert its motion entitled “Motion for Partial Summary Judgment” into a motion for total summary judgment, and it argues that its motion notified NL that GHR was attacking the entire complaint. At the beginning of its motion, GHR stated that it was asking for summary judgment against NL on “claims for damages in excess of [NL’s] alleged administrative claim expense and upon the issues of negligence and breach of contract.” See Partial Summary Judgment Motion at 1 (emphasis added). GHR contends that this phrase notified NL that it was asking the district court to dismiss everything other than NL’s administrative claim, which was still pending before the bankruptcy court. Therefore, GHR reasons, because NL’s administrative claim is still “pending,” GHR’s motion really was a motion for “partial” summary judgment.
GHR’s argument is disingenuous. First, it is clear from reading the entire motion that GHR used the phrase “claims for damages in excess of [NL’s] alleged administrative claim” to refer to NL’s claim for punitive damages for which NL did not file a proof of claim and which, therefore, exceeded NL’s administrative claim. Second, NL’s administrative claim in the bankruptcy court encompassed NL’s district court claims. As the bankruptcy judge pointed out when he recommended that the district court take jurisdiction over NL’s action, NL was required to “file a proof of claim in order to preserve its right of recovery against the debtor and to place all parties on notice of its claim.” See Recommendation at 2 n. 1, R. at 808. See also Reading Co. v. Brown, 391 U.S. 471, 483, 88 S.Ct. 1759, 1766, 20 L.Ed.2d 751 (1968) (holding that district court properly classified tort claim against bankrupt’s receiver as an administrative expense). If NL had not filed an administrative claim for the amount of actual damages it was seeking in the district court, confirmation of GHR’s reorganization plan would have discharged that liability. See Bankr.Code § 1141. In other words, NL’s administrative claim is incorporeal; it does not entitle NL to any damages absent a determination of liability in the district court.
Because NL did not receive notice that the district court was considering dismissing its entire complaint against GHR, that portion of the summary judgment which granted GHR relief exceeding that which it requested is reversed. The remaining fraud and mistake complaints should be resolved by the district court, not the bankruptcy court, see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 61, 102 S.Ct. 2858, 2866, 73 L.Ed.2d 598 (1982), and, therefore, we remand those claims to the district court with instructions to retain jurisdiction of those claims until it has disposed of them.

2. NL’s Motion to Amend Its Pleading

After GHR filed its motion for partial summary judgment, NL sought to amend its pleading to allege additional complaints against GHR. The district court denied that motion because it “would not add to or detract from the Court’s decision to grant [GHR’s] motion[] for summary judgment.” See Order, reprinted in R., vol. 1, tab 202, at 50. NL sought to amend its pleading more than three years after it filed its first complaint against GHR and only after GHR moved for summary judgment. Therefore, the district court would not have abused its discretion had it chosen to deny NL leave to amend because of undue delay. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). However, because the court tied its refusal to the order granting summary judgment, and because the summary judgment was too broad, we will reverse the order denying leave to amend and give the district court the opportunity to reconsider its decision in the light of this opinion. We now consider whether the district court properly granted summary judgment on those issues that were raised in GHR’s motion.
*432 D. Issues Addressed in GHR’s Motion for Partial Summary Judgment

1. Punitive Damages

When NL filed its initial complaint against GHR, it alleged that it had suffered $15,157,491 in actual damages, and it requested “three times that amount” in punitive damages. See Complaint at 7. But when NL submitted its proof of claim to the bankruptcy court, it stated that the “full amount” of GHR’s liability was $15,-157,491. See Proof of Claim at 2. The proof of claim never referred to NL’s request for $45 million in punitive damages.
A creditor pursuing litigation against a Chapter 11 debtor must file a proof of claim before the debtor’s plan is confirmed in order to preserve its right to enforce a potential judgment against the debtor. See Bankr.Code §§ 501-503, 507(a)(1), 1141. The proof of claim notifies other creditors of the possible liability of the debtor and enables them to make an informed decision regarding the debtor’s financial viability should it be required to pay this judgment. Therefore, the extent of NL’s administrative expense claim was $15,157,491, which NL stated was the full amount of the damages it was seeking from GHR, and when GHR’s Chapter 11 plan was confirmed, GHR was discharged from any debt that exceeded that amount. See Bankr.Code § 1141(d)(1)(A); Findings of Fact, Conclusions of Law and Order Confirming Debtors’ Amended and Restated Negotiated Chapter 11 Plan (“Plan”) at 10-11, reprinted in GHR Supplemental Record Excerpts, vol. 1, tab 1, at 60.
NL contends that the bankruptcy court was notified of the substance of its pleading and, therefore, that it provided for any damages which might flow from that complaint, even if these damages were not raised in the proof of claim. To support its position, NL cites In re Pizza of Hawaii, Inc., 761 F.2d 1374 (9th Cir.1985). In Pizza of Hawaii, the creditor, involved in litigation with the debtor, did not file a formal proof of claim for the debtor’s potential liability but did submit documents to the court indicating the nature of its claim. See 761 F.2d at 1380, 1381. The Ninth Circuit held that these documents constituted an informal proof of claim, and it reversed an order confirming a debtor’s Chapter 11 plan because the plan did not adequately provide for payment- of the creditor’s pending complaint. See id. at 1381-82.
Pizza of Hawaii is inefficacious for a number of reasons. First, in that case the creditor was appealing the confirmation of the plan, whereas in this case the bankruptcy court overruled NL’s objections to the confirmation of GHR’s plan because NL failed to submit them in a timely manner. See Plan at 8. NL did not appeal that ruling. Second, in Pizza of Hawaii, the court noted that, although the documents submitted to the court did not quantify the creditor’s damages, the creditor “simply could not be more specific in its request for damages.” See 761 F.2d at 1381. In this case, NL did quantify its damages; it simply did not include its punitive damage claim in that calculation. Finally, we doubt that NL’s punitive damage complaint was cognizable as an administrative expense even if NL had included this amount in its proof of claim. See In re A.H. Robins Co., 89 B.R. 555, 559 (E.D.Va.1988) (disallowing punitive damages as an administrative expense); In re Johns-Manville Corp., 68 B.R. 618, 627 (Bankr.S.D.N.Y.1986) (holding that claimants could not recover punitive damages from trust fund created following reorganization of debtor), aff'd and rev’d in part on other grounds, 78 B.R. 407 (S.D.N.Y.1987), aff'd sub nom. Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.1988). See also In re GAC Corp., 681 F.2d 1295, 1301 (11th Cir.1982) (disallowing claim for punitive damages in Chapter X proceeding, noting that punitive damages would “force innocent creditors to pay for the bankrupt’s wrongdoing”); In re Klefs-tad, 95 B.R. 622 (Bankr.W.D.Wis.1988) (disallowing State post-petition penalties on real estate taxes because they were punitive). Consequently, the district court correctly dismissed NL’s action for punitive damages.

2. Breach of the Workover Agreement

NL alleges that GHR breached the work-over agreement in three ways: first, by not *433 designing fracs based on the “Holditch Model”; second, by not obtaining economic certifications that the revenue created by the production enhancement procedures would exceed the cost of those procedures; and, finally, by failing to obtain Holditch’s approval for three of the ten fracture treatments. GHR responds that it did not breach the workover agreement but, even if it did, that article 5.2 limits NL’s damages to the incremenjtal net revenue produced by the wells.

a. Does Article 5.2 Limit NL’s Damages?

Article 5.2 states that for all claims arising under the contract, NL must look exclusively to the incremental net revenue from the wells and, if this revenue is insufficient, that NL has no recourse against GHR or any of its managers or employees.[8] GHR contends that this clause limits NL’s damages. NL responds that this is a “production payment” clause, which deals with amounts owed to NL for its services, not with damages occurring as a result of a breach of the agreement.
The district court made no ruling on the proper interpretation of article 5.2.[9] Under Texas law, however, a court must determine, as a matter of law, whether a provision in a contract is ambiguous. See Callaway v. Overholt, 796 S.W.2d 828, 831 (Tex.App.—Austin 1990, writ denied); Tus carora Corp. v. HJS Indus., Inc., 794 S.W.2d 435, 438 (Tex.App.—Corpus Christi 1990, writ denied); Richland Plantation Co. v. Justiss-Mears Oil Co., 671 F.2d 154, 156 (5th Cir.1982). Consequently, even if the district court had interpreted article 5.2, we would review its interpretation de novo. See Forest Oil Corp. v. Strata Energy, Inc., 929 F.2d 1039, 1043 (5th Cir.1991). For this reason, and because this issue was raised on summary judgment and undoubtedly will reappear following remand, we have reviewed the language of that article in the light of other provisions in the contract.
Viewed apart from the rest of the contract, the language of article 5.2 is expansive enough to encompass NL’s damage complaint against GHR for breaching the workover agreement; it states that NL must look to the incremental net revenue from the wells “for the satisfaction of all costs and contractual amounts due ... and all other claims arising” under the agreement and that, if there is a deficiency, NL shall have “no recourse” against GHR. But language in the remainder of the contract belies that interpretation and demonstrates that the parties intended this to be a production payment clause.
A production payment is a share of the mineral interest produced from land, “free of the costs of production at the surface, terminating when a given volume of production [has] been paid over or when a specified sum from the sale of such [miner- *434 ais has] been realized.” 2 Oil and Gas Law § 422, at 365-66 (1990) (footnotes omitted). It is very similar to an overriding royalty, the only difference being that an overriding royalty usually continues until the termination of the mineral lease, while a production payment usually terminates when its owner has received a specific amount of money. See id. § 422.3, at 385.
If article 5.2 is a production payment clause, it would not prevent NL from recovering additional damages if GHR breached the workover agreement. The owner or operator of a gas well must protect the interest of the owner of a production payment or an overriding royalty, particularly in a case such as this, in which the entire reimbursement for NL’s services was to come from the production payment. See id. § 420.1, at 356.1-356.2. If the owner or operator of the gas well does something to diminish the value of the mineral interest, the owner of a production payment or an overriding royalty can sue for damages. See, e.g., Whitson Co. v. Bluff Creek Oil Co., 156 Tex. 139, 146-47, 293 S.W.2d 488, 492 (1956) (holding that the operator of an oil well was liable for damages to the owner of an overriding royalty after the operator negligently destroyed the well when it attempted to eliminate excess water that the well was producing); Natural Gas Distrib. Corp. v. Williams, 355 S.W.2d 194, 198 (Tex.Civ.App.—Waco 1962, writ ref’d n.r.e.) (commingling of interest owner’s gas with gas from other wells); Natural Gas Distrib. Corp. v. Williams, 292 S.W.2d 353, 356 (Tex.Civ. App.-Beaumont 1956, writ dism’d) (producing less gas from the well than the well was entitled to produce); King v. Swanson, 291 S.W.2d 773, 776 (Tex.Civ.App.-Eastland 1956, no writ) (failure to drill an offset well).
The language of the contract supports NL’s contention that article 5.2 only refers to NL’s rights under the contract to recover its costs and does not limit NL’s damages if GHR breached the workover agreement. The most persuasive evidence that article 5.2 does not refer to “causes of action” is the language of article 4.3.k, which states that NL shall indemnify GHR “against any and all claims, demands, damages, losses, or causes of action of any kind or character (including without limitation the amounts of any judgments, penalties, interest, court costs, and legal fees incurred in the defense of same) arising in favor of any third party ...” If the parties intended article 5.2 to limit NL’s right to recovery against GHR, the parties would have used language similar to that of article 4.3.k, rather than simply stating that NL must use proceeds from the well to cover all its “claims.”
The structure of article 5 also indicates that it was meant to apply to NL’s right to compensation, not its right to tort or contract damages. The title for article 5 is “Reimbursement,” and the heading of article 5.2 is “Procedure for Reimbursement.” The introductory paragraph, article 5.1, summarizes the effect of GHR’s assignment of the proceeds production payment, stating that NL “shall be reimbursed for all costs and contractual amounts due ... and for all other claims arising ” under the contract. Thus, although article 5.1 plainly refers only to NL’s right to payment for its services, it uses language similar to that of article 5.2.
In this action, NL is not simply seeking reimbursement for the costs of its services. Rather, it is seeking to recover damages caused by GHR’s alleged breach of the terms of the workover agreement. By its terms, article 5.2 applies only to “reimbursement.” Therefore, we conclude that it is a production payment clause, not a damage limitation provision.

b. Did NL present any evidence that GHR breached the workover agreement?

NL’s primary contention is that GHR breached the workover agreement by not designing its fracture treatments in a manner consistent with the “Holditch Model.” To support its argument, NL presented an affidavit from Antonin Settari, an engineer, who defined the “Holditch Model” as a concept for fracturing wells, which appeared in various Holditch publications *435 and in professional literature. See Affidavit at 2, NL’s Exhibits, vol. 1, tab 11. Set-tari testified that under the Holditch Model, the length of the fracture treatment varies with the well drainage area and the permeability of the hydrocarbon formation. See id. at 3. According to Settari, the fracture treatments designed by GHR, which employed uniform fracture lengths of 1500 feet for each well, were experimental and did not conform to the Holditch Model. See id. at 5-7.
GHR points out that the agreement never used the term “Holditch Model” but required GHR to base its design on “a model prepared by Holditch.” See article 4.3.Í.I. GHR did design its fracture treatments using a computer program that was developed and sold by Holditch. See Transcript of Deposition of Oscar Garcia at 26-27, reprinted in Supplemental Record Excerpts for Holditch, vol. 2, tab E, at 344. Consequently, GHR contends that it complied with the contract.
After reviewing the existing record, we believe that NL has demonstrated that article 4.3.Í.1 is ambiguous and, therefore, that the district court must conduct a factual inquiry to determine what the parties understood that provision to mean. See Security State Bank v. Valley Wide Elec. Supply Co., 752 S.W.2d 661, 665 (Tex.App.-Corpus Christi 1988, writ denied); Richland Plantation, 671 F.2d at 156. First, although GHR is correct in stating that the contract did not use the term “Holditch Model,” article 4.3.Í.1 also states that “GHR shall design the specific fracture or other formation stimulation program for a particular Subject Well” (emphasis added). This language is consistent with NL’s interpretation of the clause and is inconsistent with GHR’s frac designs, which were uniform and were not designed specifically for a “particular” well.
Second, NL has shown that the fracture treatment used by GHR was uncommon at the time GHR and NL signed the workover agreement. In March 1986, three months after NL had completed the workovers, Holditch prepared a report for GHR that summarized and evaluated the production of 300 GHR wells, seven of which had been treated with the large fracture lengths. See Holditch Report, Exhibit G, Holditch & Associate Inc.’s Motion for Summary Judgment, reprinted in NL Record Excerpts, vol. 1, tab 15. The tone of that report indicates that the fracture design was new and that GHR was not sure whether it would work. The report’s stated purpose was “to assess whether the large, high sand concentration fracture treatments currently being pumped are economically justifiable.” In addition, after summarizing the theory behind the longer fracture lengths, the report stated that, “if successful," the fracs would “increase the area drained by a typical well” (emphasis added).
Finally, NL presented evidence which would support a conclusion that it had no reason to know that GHR intended to use uniform fracs to enhance production from all the wells.[10] These frac designs were used in only three of the fifty-five wells that GHR used to promote the workovers to NL, and Peter Nielsen, NL’s Director of Planning and Business Development, testified that NL did not realize that the fracs it had agreed to finance would be substantially different from fracs that GHR had used in those fifty-five wells, see Transcript of Deposition at 982, reprinted in NL’s Exhibits, tab 4.
On appeal, GHR argues that even if its fracs did not conform to NL’s understanding of article 4.3.Í.1, the agreement provided that Holditch was to review GHR’s fracture designs and that Holditch’s approval of those designs was final and *436 binding on NL. Even though GHR is correct in its assessment of Holditch’s role in reviewing and approving its fracs, Holditch did not have the authority to approve a frac that did not conform to the agreement, i.e., one that was not “based upon a model prepared by Holditch.” If the agreement required GHR to design one type of frac, and GHR designed another, Holditch’s approval of GHR’s design would not sanitize GHR’s breach of the agreement. See Martin Bros. v. State, 146 S.W.2d 782, 785-86 (Tex.Civ.App.—Austin 1940), rev’d, on other grounds, 138 Tex. 505, 160 S.W.2d 58 (1942); W.L. Pearson & Co. v. Hutchinson County, 52 S.W.2d 509, 516 (Tex.Civ.App.—Amarillo 1932, writ ref’d) (on motion for rehearing); 7 Tex.Jur.3d Architects and Engineers § 15, at 93 (1980); 10 Tex.Jur.3d Building and Construction Contracts § 15, at 231 (1980).
Because NL has proven that a genuine dispute exists regarding the type of fracture treatment which GHR was to design for the wells, we reverse the district court’s decision to grant summary judgment on that issue. NL has presented no evidence, however, to support its contention that GHR breached two other provisions of the workover agreement. Therefore, we affirm the summary judgment on those grounds.
First, NL contends that GHR failed to submit three of the ten fracture treatments to Holditch for review and approval as required by article 4.3.Í.I. Although NL’s assertion is factually correct, article 4.3.Í.3 of the agreement provided that NL was required to notify GHR if it failed to receive the approved fracture program for a well and that, if GHR failed to respond to this notification within ten days, NL was “not to perform fracture or other formation stimulation procedures in the relevant” well. Therefore, if NL was injured by GHR’s failure to obtain Holditch’s approval, that injury was caused by NL’s own breach of the agreement.
Second, NL contends that GHR breached articles 4.1.c and 4.3.d of the agreement by failing to obtain certifications from Holditch, Huddleston, and NSA as to the economic viability of each work-over. Article 4.1.c required GHR to submit these certifications to the Banks, not NL. If GHR breached this provision, NL was not harmed. Article 4.3.d did require GHR to include these certifications in the production enhancement prognoses that it was to submit to NL, but, by its own terms, that clause did not “apply in any way to the establishment of fracture or other formation stimulation programs.” Even if it did, article 4.3.d required NL to notify GHR if the prognoses were deficient, and NL had the right to terminate the agreement if GHR failed to respond to the notification. By failing to exercise that privilege, NL waived its right to complain about GHR’s breach. See Horton v. Robinson, 776 S.W.2d 260, 264 (Tex.App. — El Paso 1989, no writ).

3. Negligence

Finally, NL contends that GHR was negligent in designing its fracs without sufficient data or experience and in underestimating the costs of the fracture treatments. Under Texas law,, if a party does not use reasonable care in performing its obligations under a contract, it is liable for damages under both contract and negligence theories. See Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153,157, 204 S.W.2d 508, 510 (1947); Byrd v. Skyline Equip. Co., 792 S.W.2d 195, 197 (Tex.App.—Austin 1990, writ denied). Under the facts of this case, however, NL’s remedy, if any, is under contract law, not negligence law. The contract provided that Holditch was to review GHR’s proposed fracture treatments and that any decision by Holditch regarding the implementation of these treatments was to be final. If NL were permitted to argue that GHR did not use reasonable care in designing the fracs even though the designs conformed to the requirements of the contract, Holditch’s role would be nugatory because its decision to approve those treatments would be meaningless. See Huey v. Davis, 556 S.W.2d 860, 864 (Tex.Civ.App.—Austin 1977) (noting that “[i]t is an established principle of law in Texas” that if parties *437 name an engineer as an arbiter under a contract, the arbiter’s decision cannot be avoided “without showing that the person so empowered was arbitrary”), rev’d on other grounds, 571 S.W.2d 859 (Tex.1978). Consequently, the district court correctly held that the provision of the contract which appointed Holditch as an arbiter also shielded GHR from liability for negligence.
III. CONCLUSION
The district court correctly determined that Holditch was an arbiter under the workover agreement. Therefore, to recover damages from Holditch, NL was required to show that Holditch was guilty of fraud or extreme misconduct. NL’s complaint alleged only that Holditch was negligent. Consequently, the district court’s decision to grant summary judgment in favor of Holditch is AFFIRMED.
In its motion for partial summary judgment, GHR did not ask the district court to dismiss NL’s fraud and mutual mistake complaints. Because the district court rejected those complaints without notifying NL that it intended to do so, that portion of the district court’s order is REVERSED, and those claims are REMANDED to the district court for further proceedings. We also REVERSE and REMAND one issue that was raised in NL’s breach of contract complaint and was addressed in GHR’s motion for partial summary judgment: did the fracs that GHR designed for the ten gas wells meet the requirements of article 4.3.-i.l of the workover agreement? The remainder of the court’s order, which dismissed NL’s request for punitive damages, its negligence complaint, and the rest of its breach of contract complaint, is AFFIRMED.

. After the Chapter 11 petitions were filed, GHR continued to operate its business as a debtor in possession under the name "TransAmerican Natural Gas Corporation."

. For the numerous ways in which production from a well can be enhanced, see 8 H. Williams & C. Meyers, Oil and Gas Law 758 (1987).

. Specifically, the agreement states that
GHR shall design the specific fracture or other formation stimulation program for a particular Subject Well based upon a model prepared by Holditch, and shall submit to Hol-ditch for review and approval the design for each proposed fracture or other formation stimulation program and an authority for expenditure ("AFE”) setting forth the estimated costs to be incurred in connection therewith. If Holditch does not approve the design and AFE for the relevant proposed program, Hol-ditch shall make such modifications thereto as Holditch deems necessary. GHR and [NL] understand and agree that all decisions or modifications by Holditch of or with respect to any proposed fracture or other formation stimulation program submitted by GHR pursuant hereto shall be final and binding upon the Parties. Any fracture or other formation stimulation program designed by GHR and approved by Holditch as provided herein shall be referred to hereinafter as an "Approved Fracture Program.”
See article 4.3-i.l (emphasis added).

. For example, the bankruptcy court required that the agreement contain the following provisions: that GHR was not permitted to authorize production enhancement procedures on any wells other than the initial ten wells without obtaining written permission from the Banks; NL was not permitted to exercise its right of first refusal for the performance of production enhancement procedures on the additional wells unless the Banks received written verification that NL had matched the lowest bid for these services; and that NL would commit a material breach of the agreement if it failed to pay its contractors or if it allowed a material-man’s lien to encumber the wells. See Order Authorizing Debtors to Enter Into Agreement for Recompletion, Reworking and Related Activities with NL Industries, Inc., reprinted in Defendants GHR Energy Corporation and Southern States Exploration Inc.'s Motion for Partial Summary Judgment, Exhibit A, tab 135.

.For example, the Banks had the right to monitor NL’s progress in servicing the wells. See article 4.3.J. Also, GHR could not authorize production enhancement procedures for any well producing more than 2,000,000 cubic feet of gas per day without the Banks’ permission. See article 4.1.c.

. For the full text of article 4.3.Í.1, see note 3, supra.

. In its motion for partial summary judgment on NL’s breach of contract action, GHR only raised the affirmative defense that the workover agreement limited NL's recovery to revenue from the wells, but in its response to this motion, NL not only attacked this affirmative defense but also argued the merits of its complaint. See NL’s Memorandum in Opposition to Motion for Partial Summary Judgment of GHR Energy Corporation and Southern States Exploration, Inc. at 26-32, reprinted in R., vol. 1, tab 152, at 217. In a supplemental brief, GHR responded to the issues raised by NL. Presumably for this reason, NL concedes that the partial summary judgment motion encompassed its breach of contract complaint. See Appellant Brief for NL at 24.

. The relevant portion of article 5.2 states that NL
shall look exclusively to the Incremental Net Revenues received by [NL] under the terms of the Assignments covering the relevant series of Subject Wells for the satisfaction of all costs and contractual amounts due to be paid to [NL] pursuant to the terms hereof and for all other claims arising hereunder with respect to such series of Subject Wells. If the Incremental Net Revenues from the relevant series of Subject Wells are insufficient to satisfy in full all of such costs, contractual amounts due, and all other claims occurring hereunder to be paid to [NL] pursuant hereto with respect to such series of Subject Wells, neither GHR not [sic] any officer, director, shareholder, employee, subsidiary, or affiliate of GHR shall be personally liable for the payment of any such deficiency and [NL] shall have no recourse against GHR, any of the officers, directors, shareholders, employees, subsidiaries, or affiliates of GHR, or any other assets or property of GHR in the event of such a deficiency.
(emphasis added).

. NL asserts that the district court held that article 5.2 "precluded GHR from being liable for any revenue shortfall regardless of GHR's misrepresentation, fraud, mutual mistake, negligence, gross negligence, or breach of contract." See Appellant Brief for NL at 27 (emphasis in original). The district court made no such finding. In its recitation of the facts, the court noted that "the agreement and the Plan state that in the event the revenues are insufficient, NL Industries has no recourse against GHR, its officers, agents or affiliates.” See Summary Judgment (GHR) at 2. This just paraphrases the wording of article 5.2.

. Even if GHR did subjectively intend to use longer fracture treatments when it signed the contract, NL's interpretation will be upheld if NL had no reason to know GHR’s intention, and GHR had reason to know that NL thought that GHR was going to use the more conventional fracs. See Restatement (Second) of Contracts § 20(2)(b) (1981); Exxon Corp. v. Bell, 695 S.W.2d 788, 790 (Tex.App.—Texarkana 1985, no writ); Volpe v. Schlobohm, 614 S.W.2d 615, 618 (Tex.App.—Texarkana 1981, no writ); Mid-South Packers, Inc. v. Shoney’s, Inc., 761 F.2d 1117, 1122 (5th Cir.1985).